St. Louis Southwestern Railway Company v. Rogers.

## Opinion delivered December 8, 1924.

1. Master and servant—death of servant—evidence.—In an action for the death of a railroad brakeman, evidence *held* to sustain a finding that deceased was killed while under a freight car repairing a leaking air valve of the train.

2. Master and servant—duty of engineer to give warning.—In an action for the death of a brakeman killed while repairing a defective air valve, evidence *held* to sustain a finding that it was the engineer's duty to signal a warning to the brakeman of his intention to start the train.

3. Master and servant—death of servant—proximate cause.—In an action for the death of a brakeman killed when the train was moved while he was repairing a defective air valve, evidence *held* to sustain a finding that the engineer's starting the train without a signal was the proximate cause of the brakeman's death.

4. Master and servant—death of servant—contributory negligence.—In an action for the death of a brakeman, killed when the train was moved while he was repairing a leaking valve, evidence *held* to support a finding that he exercised due care for his own safety.

5. Master and servant—death of servant—instruction.—In an action for the negligent killing of a railroad brakeman, where the answer alleged that deceased's negligence was the sole cause of the injury, it was not error to give an instruction defining contributory negligence, since the jury might have found defendant guilty of contributory negligence, though it was not pleaded.

6. Master and servant—negligence of engineer in starting train.—Where an engineer, under defendant's operating rule, was not permitted to start his train except upon signal from a brakeman, mere blowing of the whistle by the engineer in the usual way as a signal of intention to start the train *held* not, as matter of law, to excuse the starting without signal from the injured brakeman, in the absence of a showing that he heard the signal.

7. Trial—construing instructions together.—In an action for the negligent killing of a brakeman, who died shortly after his injuries, where plaintiff's instruction authorized a recovery for conscious pain and suffering, and defendant's instruction stated that no recovery could be had for pain and suffering if the latter was contemporaneous and incidental to death, *held* that there was no conflict between the instructions.

8. Trial—Oral Instructions—Effect of Withdrawal.—The giving of oral instructions to the jury was cured by withdrawing them and submitting the case upon written instructions.

Appeal from Prairie Circuit Court, Southern District; *George W. Clark,* Judge; affirmed.

*J. R. Turney* and *Lamb & Frierson,* for appellant.

There is no presumption of negligence in this case, and plaintiff cannot recover in the absence of negligence by defendant. 62 L. ed. 167. Independently of the Federal statute, plaintiff could not recover without proof of negligence, since deceased was a member of the 'train crew by whose alleged negligenec the injury was caused. 100 Ark. 467. It was incumbent upon the plaintiff to negative any inference that the injury resulted from a danger or cause for which the defendant was not responsible and to take the case out of the realm of speculation and conjecture, and if, from the evidence, it appears that the injury might have been due to a cause for which the defendant was not responsible as well as to one for which it was, there can be no recovery. 109 Ark. 206; 116 Ark. 56; 105 Ark. 161; 35 N. E. 89; 105 N. W. 197; 64 Ill. App. 249; 158 Mass. 36; 113 Mich. 582; 20 N. Y. 65; 58 N. J. L. 658; 117 Ind. 439; 28 Wis. 522; 10 Or. 161; 18 Atl. 334. Instruction No. 4 did not correctly define contributory negligence. It can only exist as a coordinate or counterpart of or with negligence on the part of the defendant, of which there was none. 38 Fed. 711; 156 Cal. 58; 112 La. 599; 153 Ind. 163. Instruction No. 5, after allowing damages to the widow and child for pecuniary benefits, also allowed further damages for the physical pain and anguish suffered 'by deceased, which was error. 237 U. S. 48. It was in conflict with instruction No. 10.

*Tom Campbell,* and *Pace & Davis,* for appellee.

In testing the legal sufficiency of evidence to support a verdict for a plaintiff, it must be considered in the light most favorable to plaintiff. 131 Ark. 593; 131 Ark. 509; 133 Ark. 30; 147 Ark. 159; 157 Ark. 409; 158 Ark. 598. It is not necessary for the facts to establish negli-

gence conclusively, but is sufficient if negligence may be fairly inferred therefrom.    107 Ark. 486; 103 Ark. 61. A cause will not be reversed on appeal where there is any substantial evidence to support it.    129 Ark. 369. Instruction No. 4 correctly defined contributory negligence under the following decisions: 77 Ark. 367; 101 Ark. 376; 78 Ark. 103.    Instructions 5 and 10 were not conflicting.    They are supplementary and must be considered together.    133 Ark. 206; 147 Ark. 302; 158 Ark. 639.

Smith, J.    Appellee brought suit under the Federal Employers' Liability Act to recover damages on account of the alleged negligent killing of E. L. Rogers, while employed as a brakeman by the appellant railroad company, on the night of September 6, 1921.

Rogers was the head brakeman on a freight train running from Stuttgart to Jonesboro, and his train had been ordered to take the passing track about one mile north of Stuttgart for the purpose of giving the right-of-way to a passenger train.    Rogers was last seen alive by the engineer of the train, swinging on the ladder of a box-car about five lengths from the engine, with his lantern in his hand.    At that time he was on the east or right side of the train, and his mangled body was found on the left or west side of the train, where he was next seen by any of the witnesses who testified in the case.    How, when or for what purpose Rogers crossed over the train or under it is one of the controlling facts in the case.

It is the theory of the defendant railroad company that, in some unexplained way, Rogers fell or was knocked from the train while it was pulling in on the passing-track. In support of this theory the defendant urges the following facts:    The train was 63 cars in length, and Rogers' duty was at the head or front of the train, near the engine, and he had no duty to perform at the rear of the train, and it is not affirmatively shown that he was performing any duty there.    As the train pulled in on the passing track, it was discovered that there was a leak in the air-line running under the cars, and Mitchell, the conductor, discovered a car where this condition existed, and

directed Yeargan, one of the brakemen, to repair or adjust this leak. There is no affirmative testimony that there was any other leaking air valve in the train. Rogers had opened the switch to the passing track, and was last seen near the engine, riding the train as it pulled into the passing-track. No member of the train crew saw him go to the rear end of the train, and no one knew that he had done so until his body was found. Indeed, it is the theory of the defendant railroad company that he had not gone there at all, but had fallen from the train, or crossed under it, and had been run over and mangled, and that the train passed on over his body until the engine was near the north end of the passing track, thus leaving Rogers' body at the rear of the train when it stopped. In further support of this theory it is pointed out that Rogers' foot was found 32 rail lengths north of the place where the body was found, thus indicating that it had been caught on the wheels and the amputated foot had been carried along the moving train until it finally fell from the wheel. Plaintiff admits that the foot was found the distance stated from the body, but insists that this fact does not tend to show that Rogers was not killed by the second movement of the train, that is, after the train had come into the passing-track and had started to pull out of this track on to the main line, and that the foot hung on the brakebeam or other attachment of the trucks until the train started to leave the next morning, when it was jostled loose and fell to the ground, when the car was moved 32 rail lengths north of where the body was found.

The testimony shows that, when a freight train stops, it is the duty of the brakemen to look for hot boxes, leaking air valves, broken brakebeams, or other trouble with the train equipment, and it is the theory of the plaintiff that the leaking valve which Conductor Mitchell told brakeman Yeargan to repair was not the only leaking air valve, and that, when Rogers caught the car near the engine, he went over to the west, or left, side of the train, and dropped off the car on which he was last seen riding,

and there waited for the cars to pass by, as the train rolled through the passing-track, searching for a leak; that Yeargan repaired the leak pointed out to him by Mitchell, which was near the middle of the train, and Rogers, seeing Yeargan on the car where the known leak existed, permitted the train to pass on until another leak was discovered. The presence of a leak was discoverable by the hissing sound made. No leak was discovered by Rogers until about the fifteenth car from the rear of the train passed, and Rogers caught this car and rode it until the train stopped, and then went under the train from the west side of the train to repair the leak, as Yeargan had done to repair the one near the center of the train.

On behalf of the defendant railroad company it is insisted that this is all surmise and conjecture, and that there was no testimony upon which the jury could find the facts so to be. One reason for this insistence is that only one leak was found, and that was the one which Yeargan repaired.

We do not think, however, that this theory is mere surmise. On the contrary, there is substantial testimony upon which to base it. One significant fact is that, although it is insisted that only one leak was admitted to exist by the train crew who testified on behalf of the railroad company, there was great difficulty in moving the train on to the passing-track, and difficulty was also experienced in starting the train as it moved to pull out of this track, and the witnesses testified that this resulted from the brakes locking on account of escaping air. Another circumstance even more significant is that, when the body of Rogers was found, his hat and lantern were found near his body in the center of the track on which he was killed. There were no bruises about Rogers' body above his waist, except a small scratch on his forehead which did not break the skin. The hat, a straw one, was undamaged, and the lantern, which was also undamaged, was setting upright, although it was extinguished. The earth was disturbed where the hat was found in a manner which looked as if it had been done by one's heel.

These circumstances tend strongly to refute the theory that Rogers had fallen between the cars, and the jury was warranted in finding that these circumstances support the theory that Rogers was engaged in repairing, or had just completed repairing, a leak under the car where he had been working.

It will be borne in mind that no one saw Rogers killed, yet he was killed, and the testimony establishes the fact that he was an efficient and faithful servant, thoroughly cognizant of his duties, and thoroughly familiar with the rules under which trains operated, and one of his fellow-brakemen testified that he was a man who always did his part.

We are unable therefore to say that the finding by the jury that Rogers was, in fact, engaged in repairing a leak was mere surmise or conjecture.

In the case of *St. L. I. M. & S. R. Co.* v. *Hempfling,* 107 Ark. 476, we said: "In actions for damages on account of negligence, plaintiff is bound to prove not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. The rule does not require, however, that there must be direct proof of the fact itself. This would often be impossible. It will be sufficient if the facts proved are of such a nature and are so connected and related to each other that the conclusion therefrom may be fairly inferred."

It is very earnestly insisted that plaintiff's instruction numbered 1, which summarized the theory upon which a recovery was sought, was erroneous, and prejudicial. It reads as follows: "In this case, if you find from a preponderance of the evidence that the deceased, E. L. Rogers, was injured while in the employ of the defendant as a brakeman, assisting in the operation of a freight train from Pine Bluff to Jonesboro, Arkansas, and that, while said train was standing on the sidetrack at Stuttgart, said E. L. Rogers, in the performance of his duty, went between two of the cars in said train to fix the air-

line on said train, and that, while he was so engaged, the engineer carelessly and negligently, and without warning to the said E. L. Rogers that he was about so to do, started said train and ran the same over the said E. L. Rogers and injured him, and that, as a result of said injuries, the said E. L. Rogers thereafter died, and that the said engineer thereby failed to exercise ordinary care to avoid injuring the said E. L. Rogers, and that the act of the engineer in starting said train (if you find from a preponderance of the evidence that he did so start the train) was the proximate cause of the injury, and that the deceased at the time was exercising ordinary care for his own safety and had not assumed the risk, you will be authorized to find for the plaintiff, and assess damages at such a sum as will, from the evidence, fully compensate for the injuries received.''

Specific objections were made to this instruction:

(1). That there was no evidence tending to show that Rogers went between any two cars of the train to fix an air-line.

(2). That there was no evidence tending to show that it was the duty of the engineer to warn Rogers before starting the train, other than by giving the signals shown to have been given.

(3). That the failure to give the signals as shown by the evidence would not have been the direct or proximate cause of the injury.

(4). That there is no evidence to show that Rogers was exercising any care for his own safety.

(5). That there is no evidence tending to show that there was any defect in any air-line.

A discussion of these objections will dispose of the principal questions raised on this appeal.

We think it was not mere speculation or conjecture for the jury to find, from the facts herein stated, that Rogers, in the performance of his duty, had gone under a car to fix the air-line.

Upon the second objection to the instruction it may be said that the testimony shows that an operating rule

of the railroad company prohibited the engineer from moving the train unless and until some member of the train crew signaled him so to do. Had Rogers not been killed, it would have been his duty to open the switch at the north end of the passing-track to admit the passage of the train on to the main line, and it would have been the duty of the end brakeman to close this switch. The fireman himself opened this switch, being furnished a key thereto by the engineer for that purpose. No signal was, in fact, given to start the train, although the engineer and fireman testified that they looked down on the west side of the train, which was the fireman's side, and saw a man with a lantern advancing towards the engine. This man was brakeman Yeargan, but the engineer and fireman supposed it was Rogers, and that he was coming to the end of the switch, and that they saw a motion of the lantern Yeargan carried which they mistook for a signal, although they virtually admitted, on their cross-examination, that they were mistaken in assuming that a signal was given. At any rate, Yeargan, the man seen advancing with the lantern, testified positively that he gave no signal, so the jury was warranted in finding that no signal was given for the train to start. The testimony shows that there was trouble with the air-line. This was evidenced by the difficulty in moving the train, and the testimony further shows that the existence of such trouble would be registered on a gauge in the engine. After the train had been standing for ten or fifteen minutes, the engineer blew four blasts of the whistle, which was a signal to the crew that the engineer was awaiting orders, and after doing this, and after seeing Yeargan come up the track, the engineer blew two blasts of the whistle, which was a signal that he was about to move forward.

We think, from this testimony, the jury was warranted in finding that there was trouble with the air-line, and that the engineer knew this fact, and should have known that an effort would be made to remedy this trouble. Indeed, the fireman testified that, after waiting about ten minutes for a signal, he said to the engineer:

"They have all been busy back there, and I will line the switch up," and if it be true, as the jury might have found from the testimony recited, that the engineer knew that the train crew were engaged about the train, then the jury was warranted in finding that the engineer should have given warning that he was about to start the train, especially so if he had received no signal to start it.

As to the objection that the failure of the engineer to signal that he was about to start the train was not the proximate cause of the injury, it may be said that, if Rogers was, in fact, engaged in repairing a leak at the time he was killed, the starting of the train was the proximate cause of his death, as he had the right to assume that the engineer would not start the train until he was signaled so to do. Of course, if a signal had been given to start, obedience thereto would have exonerated the engineer from the charge of negligence, and the question which would then have been presented would have been whether the signal to start was negligently given. But, as the train started without any signal so to do, we think the jury was warranted in finding that this negligent act was the proximate cause of the injury.

As to the objection that there was no evidence that Rogers was exercising any care for his own safety, it may be said that the jury, in determining this question, might have concluded that Rogers was in the exercise of due care, in that he was performing a duty incumbent upon him as brakeman, and that it was not negligence for him to be engaged in the discharge of this duty, inasmuch as it was his duty to open the switch for the train to leave the passing-track, a fact known to the engineer, and that he had the right to assume that no other member of the train crew would attempt to discharge this duty of his without knowing why he did not do so himself.

As to the last objection, that there was no evidence that there was any defect in the air-line in the rear of the train, where Rogers was killed, we think it appears, from the testimony set out above, that the jury might have found this was not mere speculation or conjecture.

It is true, Conductor Mitchell and rear brakeman Crowder testified that there was no such defect, that the inspection made after the injury disclosed none, but their testimony at the trial is not in harmony with the testimony given by them on this subject in depositions taken before the trial, and we cannot say that it was arbitrary for the jury to refuse to accept as true their testimony at the trial, that there was no leak in the rear of the train for Rogers to fix. Besides, Rogers might have finished the job of adjusting the leak which called him under the train before he was killed.

The court gave an instruction on the question of contributory negligence, to which the defendant objected on the grounds that the instruction did not correctly define that defense, and also that no such issue had been raised by the pleadings. We do not think either objection is well taken. The instruction is in a form which has frequently been approved by this court, and we think no prejudicial error was committed in giving the instruction on that subject, although the defendant did not plead contributory negligence. The answer alleged that the negligence of Rogers was the sole cause of his injury. Of course, if this were true, there was no question of contributory negligence. But the jury might have found that the railroad company was guilty of negligence, in which event the question would naturally arise whether Rogers was not also guilty of negligence contributing to his injury, and it was not therefore improper for the court to declare the law of that subject.

The defendant asked an instruction numbered 9 to the effect that, if the jury found that it was not the duty of the engineer to learn or know where Rogers was, and that, before starting the train, the engineer gave two distinct blasts of the whistle, and that such blasts were the usual and well-known signals that the train would start, and that ample time was given, after so blowing the whistle, for Rogers to have gotten into a place of safety, that there was no negligence on the part of the engineer in starting the train.

We think no error was committed in refusing this instruction. If the engineer had no right to start the train without a signal, and if it was negligence so to do, then it could not be said as a matter of law that merely blowing the whistle absolved the act of starting the train without a signal of its negligent character. It will be observed that the instruction did not impose the requirement that Rogers heard or should have heard the whistle.

An instruction numbered 8, requested by defendant, embodied this same idea; but this instruction which was given, was modified to impose the requirement that deceased heard the whistle, or, by the exercise of ordinary care for his own safety, should have heard it. We think no error was committed in thus modifying the instruction. Without this modification the engineer could move his train in violation of an operating rule of the company that he should not do so except upon signal, and be excused from the charge of negligence, if he, in fact, gave a signal that he was going to do so in time for the persons who knew the significance of the signal to reach places of safety by exercising reasonable care to do so, whether they heard the signals or not. This is not the law.

In instruction numbered 5, given at the request of the plaintiff, the jury was told, if they found for the plaintiff, that "you will also assess further damages for such a sum as will reasonably compensate for the physical pain and mental anguish suffered and endured by Rogers as a result of said accident. if any, from the time of the alleged injury until his death."

The specific objection made to this instruction, in addition to the one that there was no evidence entitling plaintiff to recover, was that if, after Rogers was injured, he was conscious to any extent, such consciousness continued but for a few moments, and his expressions of pain and suffering were practically contemporaneous with his injury and death, there could be no separate award on that account.

The court gave on this subject, at the request of defendant, an instruction numbered 10, reading as follows: "If you find from the evidence that the time between the injury and death of Rogers was but a few minutes; that he was conscious during any part of such time, and experienced pain and suffering, but that this period and the pain and suffering were substantially contemporaneous with his death and were incident to it; that the injuries sustained were such as to necessarily result in death, and that death did follow in close, natural and necessary sequence, notwithstanding there may have been moments of sensibility, then you cannot find any separate verdict or award any separate amount on account of such pain and suffering."

This instruction numbered 10 conforms to the law as thus announced by the Supreme Court of the United States in actions for damages under the Federal Employers' Liability Act, in the case of *St. L. I. M. & S. R. Co.* v. *Craft,* 237 U. S. 648, 59 L. ed. 1160, 18 R. C. L., title Master and Servant, § 326, and it would, of course, be erroneous to give an instruction in conflict with it. We think, however, the two instructions may be read together, and that, when this is done, there is no conflict between them. The plaintiff's instruction told the jury that there may be a recovery for conscious pain and suffering, and this is permitted under the Federal statute. The defendant's instruction numbered 10 modifies this statement by advising the jury that there can be no recovery if such pain and suffering is contemporaneous and incidental to death. The defendant's instruction dealt only with the exception when such a recovery would be denied, and it will therefore be regarded as a modification of the plaintiff's instruction. It would have been a better practice to have combined the two into a single instruction stating the rule and the exception thereto, but this was not requested.

It is also insisted that there was no testimony to support the finding that Rogers suffered consciously. But we are unable to say that this was not a question for

the jury.   Rogers lay mangled for some minutes before he was discovered.   He was found by rear brakeman Crowder after that employee had left the caboose to ascertain the cause of the delay in starting the train. When Crowder found Rogers, he reported Rogers' condition to the conductor, who ordered Crowder to cut loose a refrigerator car, or a freezer, as the train crew called it, near the head of the engine, and to back it down to where Rogers was for the purpose of putting Rogers on the cot which had been procured, and carrying him back to Stuttgart for medical treatment.   The testimony is to the effect that, when the train crew came up to Rogers, he appeared to be suffering.   He was asked how he had got hurt, but he made no reply.   The conductor testified as follows: "When I first reached Rogers, and before I started to find Yeargan, he raised himself up to a sitting position, and I caught him by the shoulders and spoke to him, and asked him how he got hurt.   He looked at me, but spoke no word.   He sort of wrenched himself out of my hands and turned over on his right side.   Then he raised up again to a sitting position.   I spoke to him again, and again asked him how he got hurt.   He just looked at me, and never did say a word.   Then he turned over on his right side and exclaimed, 'Oh, Lord!' "

Other members of the crew testified to substantially the same effect, and we cannot say therefore that there was no testimony that Rogers did not suffer any pain except the expiring agony of death.

At the conclusion of the argument the court gave an oral instruction, to which the defendant objected.   The bill of exceptions recites that Mr. Pace, of counsel for plaintiff, "then requested the court, since objections had been made by Mr. Lamb, attorney for the defendant, to the oral statements to the jury by the court, that the court withdraw these statements from the jury and let the jury decide the case upon the written instructions that had heretofore been read to the jury.   Thereupon the court agreed to do this. and said to the jury: 'I will read you again the written instructions, which are the

rules of law that shall govern you in your deliberations in this case, and they are the only instructions that you are to consider in the case.' The court then read again the written instructions given in the case. Mr. Lamb then stated: 'I want the oral instructions written out and read to the jury, and then have the court to tell the jury that they are not to consider them as part of the instructions in the case.' The court said: 'I have told them that the instructions as given them now are the only instructions that they are to consider in this case.' Mr. Pace said: 'You mean by that that these last instructions are the only ones that they are to consider in this case?' The court said: 'Yes, sir; and I also told them, in the last statement made, and I now tell them, that the instructions I just read to them, and the evidence in this case, is the only guide they shall consider in arriving at their verdict in this case.' After the jury retired, Mr. Lamb stated to the court: 'And the court refuses to recall the jury and tell them that the oral instruction is specifically withdrawn?' The court answered: 'They were withdrawn by the declaration of the court to the jury heretofore made.' "

The defendant then excepted to the action of the court in refusing to recall the jury and state to them specifically that the oral instruction had been withdrawn.

We think it sufficiently appears, from the recitals of the record set out above, that the oral instruction given by the court had been withdrawn and that the case was submitted to the jury under the written instruction only, and that this removed any prejudice there may have been in having given the oral instruction.

Numerous exceptions to the giving and to the refusal to give other instructions are argued; but, as they relate to questions which have been frequently passed upon by this court, we do not discuss them. It suffices to say that we find no error in the particulars stated.

The case is a close one on the facts, but, considered in its entirety, we think that the inferences could be

drawn from the testimony recited raising the issues herein discussed for the decision of the jury, and, as we find no prejudicial error, the judgment is affirmed.